**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**COLUMBIA DIVISION**

| | |
|---|---|
| HERMENIA PERKINS-BROWN, ) <br> VONETTA HARRIS, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> TRI COUNTY ELECTRIC ) <br> COOPERATIVE, ) <br> ) <br> Defendant. ) <br> _____) | Civil Action No. 3:06-3512-CMC-JRM <br><br> **REPORT AND RECOMMENDATION** |

Plaintiffs, Hermenia Perkins-Brown ("Perkins-Brown") and Vonetta Harris ("Harris") are former and current (respectively) employees of Tri-County Electric Cooperative, Inc. ("TCEC"). They filed this action on December 13, 2006 asserting Title VII claims for disparity in pay based on race and a racially hostile work environment. Pretrial matters were automatically referred to the undersigned pursuant to 28 U.S.C. § 636 and Local Rule 73.02(B)(2)(g). TCEC filed a motion for summary judgment on April 3, 2008. Plaintiffs filed a response on May 20, 2008. Plaintiffs filed their reply on June 2, 2008.

**Standard for Summary Judgment**

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of

1

mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits [see Fed. R. Civ. P. 56(e)], depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that

would apply at a trial on the merits." Mitchell v. Data General Corporation, 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Services Co., 875 F. Supp. 1115 (D.Md. 1995).

**Facts**

The following facts are either undisputed or are stated in the light most favorable to the Plaintiffs.

1. Plaintiffs are African-American

2. Plaintiffs began employment with TCEC in August of 1999 as Consumer Services Cashiers.

3. TCEC is a consumer owned electric distribution organization which serves six countries in the Mid-lands of South Carolina. Its main office is near St. Matthews, and it operates branch offices in Santee and Eastover.

4. When Plaintiffs were hired, Robert Wannamaker ("Wannamaker") was General Manager/CEO of TCEC.

5. When Plaintiffs were hired, Lori Griffith was already employed as a Consumer Services Clerk.

6. Plaintiffs worked in Eastover, while Griffith worked in St. Matthews.

7. On October 31, 2000 a reorganization resulted in all Consumer Services Cashiers and Consumer Services Clerks becoming Consumer Services Representatives ("CSRs").

8. Griffith received substantial raises in October of 2000 and 2001 which resulted in her being paid more than Plaintiffs and other CSRs. (Pl.Mem., Ex.B, Att.6; Def.Mem.Ex.3).

9. Robert Paulling ("Paulling") replaced Wannamaker as General Manager/CEO in August of 2004. (Def.Mem., Ex.14).

10. Paulling stated that he intended to meet with each of TCEC's employees one on one. He did not meet with Plaintiffs until 2006. (Def.Mem., Ex. 14, ¶19).

11. On September 30, 2004 Paulling held his first TCEC - wide meeting with a large number of employees. Perkins-Brown attended, but Harris did not. During the meeting, Paulling "used the symbolism of a standard, off-the-shelf, yellow triple braid rope to impress upon those present...how I wanted the employees of the Co-op to work together as a single, unified team." (Res.Mem., Ex.14, ¶ 7).

12. An ice storm occurred on December 26, 2004 which required overtime by TCEC employees. Plaintiffs raised an issue that they were entitled to "holiday pay." (Def.Mem., Ex. 14, ¶ 13).

13. On July 12, 2005, Charlene Anderson ("Anderson"), TCEC's Human Resources/Safety Coordinator, received a report that earlier in the month three TCEC employees used racial slurs when talking to or about African-American employees. Anderson investigated the allegations and counseled the offenders. (Pl.Mem., Ex.B, Att.6). The offending conduct occurred at the St. Matthews office. Plaintiffs were not "witnesses" to the offensive comments nor were they the object of the offensive comments." (Def.Mem., Ex.13, ¶ 16).

14. In August of 2005 TCEC posted a vacancy for a new Collections Coordinator position. Perkins-Brown, Griffith, and two others applied for the job. On September 5, 2005, after interviewing for the position, Perkins-Brown wrote Anderson and withdrew from consideration. Griffith was awarded the position. (Def.Mem., Ex.8 and 13, ¶ 3).

15. On January 18, 2006 Perkins-Brown and Harris filed charges of race discrimination with the South Carolina Human Affairs Commission. (Pl.Mem., Ex.B, Att.16 and Harris Dep., Ex.11).

16. In 2006 TCEC changed the titles of CSRs to Member Support Representatives ("MSRs"). (Pl.Ex. 13, ¶ 10).

17. Perkins-Brown voluntarily left TCEC in June of 2007. (Perkins-Brown Dep., p. 5).

**Discussion**

Plaintiffs assert that TCEC discriminated against them with respect to pay because of their race and subjected them to a racially hostile work environment.

**A. Disparate Treatment - Pay**

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race".  42 U.S.C. § 2000e-2(a)(1).  In a disparate treatment case the Plaintiffs must prove that "but for" their race, they would not have been subjected to an adverse employment action.  Holmes v. Bevilacqua, 794 F.2d 142 (4th Cir. 1986).  A Plaintiff can prove defendant's motive to discriminate by two methods.  First, the "Plaintiff(s) may meet this burden under the ordinary standards of proof by direct[1] and indirect evidence relevant to and sufficiently probative of the issue.  In the alternative, a Plaintiff may resort to the judicially created scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981)." EEOC v. Clay Printing Company, 955 F.2d 936 (4th Cir. 1992).

Here, Plaintiffs assert that TCEC violated Title VII by paying them an unequal amount because of their race. To establish a prima facie case of discriminatory compensation, Plaintiffs must show "(1) that they are members of a protected class; (2) that they were paid less than a non-minority employee; and (3) that the higher paid employee was performing a job substantially similar to the Plaintiffs". Brinkley-Obu v. Hughes Training, Inc. , 36 F.3d 336, 343 (4th Cir. 1994); Gbenoba v. Montgomery County Department of Social Services, 209 F.Supp.2d 572, 579 (D.Md. 2002); and

---

[1]Plaintiff has presented no direct evidence of discrimination.

Baldwin v. City of Chester, 2006 WL 2541880 (D.S.C. 2006). It is undisputed that Plaintiffs are members of a protected class and that they were paid less than their named comparator, Griffith. TCEC argues that Plaintiffs cannot establish that their jobs were substantially similar to that of Griffith. However, all had the job tile of CSR. The undersigned concludes that this is sufficient to satisfy the modest requirement of establishing a prima facie case.

Once a prima facie case has been established, a rebuttable presumption arises that the employer unlawfully discriminated against the Plaintiffs. The burden of production then shifts to the employer to show a legitimate, non-discriminatory reason for its actions. Once the employer articulates its reasons, the burden returns to Plaintiff to come forward with evidence that the employer's asserted reasons for its actions are a mere pretext for its discriminatory motives. McDonnell Douglas, 411 U.S. at 802-805. Despite these shifting burdens, Plaintiffs bear the ultimate burden of persuasion on the issue of discrimination under the "pretext" analysis. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1983).

TCEC makes an alternative argument that if Plaintiffs are successful in establishing a prima facie case of unequal compensation that the same reasons it advanced in connection with respect to the third prong of the analysis constitute legitimate, non-discriminatory reasons for paying Plaintiffs less than Griffith. The factual underpinning of TCEC's argument is based on the affidavits of Anderson (Def.Mem., Ex. 13) and Paulling (Def.Mem., Ex. 14).

> I have had an opportunity to review the Co-op's compensation records for Customer Service Representatives. The records indicate that another Customer Service Representative, Lori Griffith, received substantial pay increases in the years 2000 and 2001 - three (3) and four (4) years before I became employed by the Co-op. These increases in compensation were approved by my predecessor, Robert Wannamaker, who retired in 2004. Ms. Griffith was a Customer Service Representative at the St. Matthews Headquarters facility from 1998 until September 2005. My understanding is that her compensation was elevated to near the mid-point in 2000, and that her

6

>position was reevaluated in 2001 due to the fact that she was spending the majority of her time training new Customer Service Representatives while also preforming the Customer Service Representative duties in a very busy environment. In effect, she was one person performing tow jobs. The demands of the job prevented her from taking vacation time, lunch hours, and having any flexibility in her work schedule. The pay increase was a recognition that her job was significantly different from that of the other Customer Service Representatives.

(Res.Mem., Ex. 14, ¶ 16).

Anderson avers that contrary to Plaintiffs' assertion Griffith was senior to both Plaintiffs.

Anderson further states:

>After reviewing the charge allegations made by Ms. Harris and Ms. Perkins-Brown, I took the opportunity to carefully review the compensation records for the Customer Service Representative position. The records indicate that another Customer Service Representative, Lori Griffith, received substantial pay increases in the years 2000 and 2001. I was employed by the Co-op at this time and am very familiar with the circumstances surrounding these pay increases. I was directly involved in the implementation of the pay increases for Ms. Griffith. These increases in compensation were approved by General Manager Bob Wannamaker, who retired in 2004. In 2000, the Co-op's Board of Directors wanted most employees (other than new employees) who were below the compensation mid-point to be brought up to around the mid-point. Ms. Griffith was a Customer Service Representative at the St. Matthews Headquarters facility from 1998 until September 2005. Her compensation was elevated to the mid-point in 2000, and her position was reevaluated in 2001 due to the fact that she was spending the majority of her time training new Customer Service Representatives while also performing the Customer Service Representative duties. (My recollection was that there was also significantly high turnover in the Customer Service Representative position in the St. Matthews Office at that time.) In effect, she was one person performing two jobs. The demands of the job prevented her from taking vacation time, lunch hours, and having any flexibility in her work schedule. CSRs at that time in the St. Matthews office were responsible for the radio, the phones, consumer complaints, walk-in traffic, the drive through window, and the mail - among other duties. Furthermore, the volume of work was substantially greater at the St. Matthews office in comparison to the Santee and Richland District Offices. The pay increase for Ms. Griffith was a recognition that her job was significantly different from that of the other Customer Service Representatives.

(Res.Mem., Ex. 13, ¶ 9).

Plaintiffs offer little evidence to contradict these assertions. At deposition Harris testified that

7

she had not worked in the St. Matthews office and was not aware of Griffith's duties. Harris assumed that because she and Griffith had the same job title they performed the same duties. (Harris Dep. 13-14). Perkins-Brown testified that during the eight (8) years she worked for TCEC she worked at the St. Matthews office for three weeks and observed Griffith. According to Perkins-Brown

> "(W)e all were C.S.R.'s. We had the same job titles. We were in the offices doing the same duties. We had the same responsibilities in that position... There may be other duties that are included, but basically the same..." (Perkins-Brown Dep., p. 26).

Thus, Perkins-Brown's qualified response indicates that Griffith may have preformed "other duties." Further, Perkins-Brown gives no reference as to when she observed Griffith.[2] Plaintiffs have failed to show pretext.

Perkins-Brown argues that TCEC discriminated against her with respect to the pay for the Collections Coordinator position for which she applied, but withdrew from consideration after she was interviewed by Anderson. Since Griffith received the position and Perkins-Brown did not, Perkins-Brown cannot establish a prima facie case of discrimination with respect to this position under the elements stated above. Perkins-Brown has not suggested an alternative framework to analyze this claim as disparate treatment in compensation.[3]

---

[2] The parties have not provided a job description for the CSR position. The undersigned assumes that TCEC does not have a written description of responsibilities of the position.

[3] The basis for Perkins-Brown's claim is not entirely clear. If Perkins-Brown is asserting that her pay as a CSR should have been the same as Griffith received as Collections Coordinator, it must fail as the record shows that the new position was not equivalent to the CSR position. Perkins-Brown appears to assert that Anderson told her during the interview for the position that her pay for the new position would not reach the salary for the "midpoint" of the position for six months after she received the position. However, it appears that Perkins-Brown and Griffith were given the same information concerning the salary increase during the interview process and that Griffith's pay was increased at the time TCEC employees normally received increases. (Perkins-Brown Dep., p. 83; Anderson Aff., ¶ 3).

8

Plaintiffs also complain that they did not receive "holiday pay" when they were called in to work after the ice storm on December 26, 2004. They have presented no evidence that white employees were paid holiday pay while there were not.

**B. Racially Hostile Work Environment.**

In order to establish a claim for a hostile work environment, a plaintiff must offer proof to demonstrate: (1) unwelcome conduct; (2) that it is based on plaintiff's race; (3) that it is sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) some basis for imputing liability on the employer. Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 710 (4th Cir. 1995) (en banc); Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-184 (4th Cir. 2001); and Gilliam v. South Carolina Department of Juvenile Justice, 474 F.3d 134, 142 (4th Cir. 2007).

Plaintiffs offer a variety of allegations which they argue constituted a racially hostile work environment. The two most serious allegations are not factually supported or were not directed at Plaintiffs. In their charges of discrimination Plaintiffs alleged that Paulling displayed a "hangman's noose" during a staff meeting and that TCEC did not appropriately respond to a report that employees had used racial slurs toward black employees. (Def.Mem., Ex. 1 and 2). These allegations were continued in the complaint. (Complaint, ¶¶ 17 and 18).

As stated above Paulling used a standard yellow rope intertwined for strength to demonstrate the need for TCEC's three offices to work together as one.[4] Perkins-Brown was present. At deposition Plaintiffs conceded that Paulling never knotted the rope or made a hangman's noose with

---

[4] Apparently after the staff meeting a piece of the rope was displayed on the employee bulletin board at each office as a reminder of Paulling's comments.

9

the rope. Both testified that it was their feeling that the use of a rope for any purpose at a staff meeting was inappropriate because of racial connotations. (Perkins-Brown Dep., p. 50-55; Harris Dep., p. 37).

The display of a hangman's noose in the workplace can reasonably be found to be a distasteful and offensive racial symbol constituting intimidating conduct. However, in the present case, a rope and not a hangman's noose was displayed as a symbol of unity and strength. A somewhat similar circumstance was discussed in Settle v. Baltimore County, 34 F.Supp.2d 969 (D.Md. 1999). In that case the plaintiff complained that a noose like device was present in the workplace. The device was "a broomstick - type of device made of wood, tape on the end where the rope would connect to the stick, knotted and made of rope with a circle opening large enough to [fit over] the average persons head." *Id*., at 1004. It was undisputed that the device was not "standard issue" but was used to facilitate functions in the workplace. The court found that "whether the object described can reasonably be called a 'noose'...is problematic, at best." *Id.* The rope as described by Plaintiffs does not approach the looped and knotted rope found in Settle. The undersigned concludes that no reasonable person would find that an ordinary piece of rope, as described by Plaintiffs and in the context it was used, was a racially insensitive and intimidating symbol.

Plaintiffs also complain about the use of racial slurs in the workplace. However, the racial slurs were not directed at Plaintiffs nor did Plaintiffs actually hear the racial slurs. The record shows three documented instances where three white employees, none of whom worked in the Eastover office, used racial slurs or demeaning language toward African-American employees. Anderson investigated the incidents. The offending employees were counseled by their supervisor.

Title VII makes it unlawful for an employer to discriminate against an employee with respect

to compensation, terms, conditions or privileges of employment based on race. 42 U.S.C. § 2000e-2(a). This includes creating or allowing a hostile work environment based on race. In this regard, "(h)ostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 116 n. 10 (2002). To prove a hostile work environment, a plaintiff must show: (1) she was harassed because of her race; (2) the harassment was unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (4) some basis for imputing liability to the employer. Howard v. Winter, 446 F.3d 559, 565 (4th Cir. 2006); Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

In Faragher v. City of Boca Raton, 524 U.S. 775 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22(1993)). A hostile work environment exists when the workplace is "permeated with discriminatory intimidation, ridicule, and insult." Harris, 510 U.S. at 21.

Among the circumstances examined are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. at 21.

Plaintiffs cite Jennings v. University of North Carolina, 482 F.3d 686, 721 (4th Cir. 2007),

*cert. denied*, ___ U.S. ___, 123 S.Ct. 247 (2007) for their argument that "indirect" conduct which cannot support a claim of harassment on its own may be "considered in the totality of the circumstances", i.e. whether the (sexual) harassment was sufficiently severe or pervasive to create a hostile work environment (Pl.Mem., p. 10). Plaintiffs are actually citing Judge Niemeyer's dissent in Jennings. Judge Niemeyer actually indicated that in the cases "which relied on background conduct in applying the 'severe or pervasive' standard, the direct harassment of the plaintiff still provided the foundation for the hostile work claim." Jennings, at 720, citing Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001); Ocheltree, *supra*; and Hopkins v. Baltimore Gas & Elec. Co., 77 F.3f 745 (4th Cir. 1996).

Thus, the racial slurs discussed above should not be considered without evidence that racial harassment was directed toward Plaintiffs.[5] Plaintiff have presented very little in the way of direct harassment. They intimate that African-American employees were required to sit together in the rear of the room during TCEC meetings. This claim was not raised in the charges of discrimination or in the complaint. Plaintiffs served requests for admissions of TCEC. Request No. 4 stated: "Admit that the plaintiffs sit in the rear of the room in meetings, apart from other personnel. TCEC responded that it does not have assigned seating during meetings and "plaintiffs may have sat in the rear of the room at one or more meetings." (Pl.Mem., Att.6). Plaintiffs have offered no specific evidence to contradict TCEC's response. (*See* Perkins-Brown Dep., 94-98; Harris Dep., 45-46).

Plaintiffs also assert that Paulling subjected them to harassment because he failed to meet

---

[5]Several other claims that Plaintiffs raise to support their hostile work environment claim also do not involve harassment directed at them. Plaintiffs assert that some white TCEC management employees were allowed to use TCEC owned vehicles while African-Americans were not afforded the same benefit. Similarly, Plaintiffs argue that some white employees were not as severely disciplined as some African-American employees.

12

with them individually until 2006. Paulling states that if he failed to meet with Plaintiffs in 2004 it was an oversight. According to Paulling the only two other individuals he did not meet with in 2004 were both white. In the light most favorable to the Plaintiffs, Paulling did not meet with them until 2006, but did meet with other African-American employees as scheduled. Plaintiffs offer no facts to contradict this interpretation of the record. (Perkins-Brown Dep., 59; Harris Dep., 44-45).

Plaintiffs have presented no evidence from which a reasonable person could conclude that they were subjected to a racially hostile work environment.

## **Conclusion**

Based on a review of the record, it is recommended that Defendant's motion for summary judgment be **granted**.

_____
Joseph R. McCrorey
United States Magistrate Judge

Columbia, South Carolina

September 30, 2008